UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACKSON BLAIN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF TRANSPORTATION, et al.,<br><br>    Defendants. | Case No. 3:22-cv-04178-WHO<br><br>**ORDER ON MOTIONS TO DISSOLVE TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION**<br><br>Re: Dkt. Nos. 67, 74 |

Five weeks ago, I issued a temporary restraining order ("TRO") to prevent the California Department of Transportation ("Caltrans") from closing the Wood Street homeless encampment on its land in Oakland, California, and clearing out homeless individuals, their possessions, and structures. I found that, based on the combination of a lack of notice—the record showed that many plaintiffs had been there for years yet were given only five days' warning of the closure—and the lack of any concrete plans for providing them alternative shelter, the plaintiffs had raised serious questions that the state would place them in undue danger, violating the Fourteenth Amendment. I also set a hearing on dissolving the TRO or granting a preliminary injunction and wrote that,

> Caltrans has raised compelling safety and health concerns about the encampment. There have been nearly 200 fires there in two years, which have claimed one life, threatened others, and damaged structures. In light of the threat to life and the proximity of the encampment to other structures that could be damaged, Caltrans is within its rights to remove individuals from its property after the period necessary to safeguard the plaintiffs' rights. This TRO is not a long-term prohibition on Caltrans's actions, it is a stopgap to prevent a particular violation of constitutional rights that results from the combination of lack of notice and failure to provide alternative shelter.

Modified Temporary Restraining Order ("TRO") [Dkt. No. 40] 2.

The defendants move to dissolve the TRO and the plaintiffs move for a preliminary

1   injunction. The motion to dissolve the TRO is granted in stages as explained more fully below
2   and the motion for a preliminary injunction is denied.

3   The temporary relief that I issued stood on the twin pillars of a lack of notice and lack of plans for adequate shelter by the state of individuals who were removed. The past five weeks, and the additional ones that I will give in this order, have helped ameliorate issues with the short notice. If Caltrans had carried out its initial plan, lives would have been uprooted with only a few days' warning and virtually no practical opportunity to find alternative shelter. Now, the plaintiffs will have had nearly two months to do so, and private and public organizations will have had that time to assist them.

I recognize that this is much easier said than done; those experiencing homelessness face many barriers in relocating to a place of relative safety and security. But there is no constitutional theory under which the plaintiffs could have remained on the land indefinitely; as I warned several times, there is no question that they would eventually have to leave. Caltrans's interests in preventing more dangerous fires, safeguarding structures, and removing health and safety hazards on its land are legitimate and compelling. And the City of Oakland has proposed a plan that, though far from perfect, will provide shelter and assistance for many Wood Street residents.

Homelessness is a difficult social problem that requires public policy solutions. These plaintiffs have effectively and movingly spoken about the community they have built and what it means to them. They have also presented many ideas for public policy solutions; the State, City, and County would be well-advised to incorporate the input and involvement of them and other individuals experiencing homelessness into their policymaking. But this lawsuit is about a particular alleged violation of constitutional rights by particular plaintiffs in the face of a particular governmental action. Based on the merits of these plaintiffs' claims and the balance of equities, the time has now come for the closure to go forward in an orderly way.

**BACKGROUND**

On July 18, 2022, the plaintiffs—individuals experiencing homelessness who reside at the Wood Street encampment—filed a complaint and application for a TRO against Caltrans, the City of Oakland, the County of Alameda, BNSF Railway, and various officials of them (as well as the

Governor of California[1]).  *See* Dkt. Nos. 1, 2.  Because the closure was set to begin on July 20, I issued a TRO to preserve the status quo, ordered that notice be given and service made on the defendants, invited the defendants to file briefs, and set a hearing for July 22.  Dkt. No. 22.  After the hearing, I issued a modified TRO, the operative one in this case.  *See* Modified TRO ("Mod. TRO") [Dkt. No. 40].  Under that TRO, Caltrans was restrained from carrying out the planned closure or removing individuals, possessions, and structures from Wood Street.[2]  *See id.* 8–9.  I ordered the parties to appear before Magistrate Judge Robert Illman "for good-faith discussions about providing individuals within the encampment with shelter and services after the closure."  *Id.* 9.  Judge Illman has now had numerous and involved meetings with the parties.  *See* Dkt. Nos. 44, 45, 46, 48, 49, 51, 65, 77, 78, 85 (minute entries).

**LEGAL STANDARD**

Federal Rule of Civil Procedure 65 governs preliminary injunctions and TROs. The standard for issuing a TRO is the same as that for issuing a preliminary injunction, which requires the plaintiff to establish: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 22.  The Ninth Circuit has held that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met."  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

---

[1] The Governor asks that I *sua sponte* dismiss him from the suit based on sovereign immunity. Dkt. No. 81.  Motions to dismiss are currently set to be heard in a few weeks and the Governor's request will be taken under submission at that more appropriate time.

[2] In the modified TRO, I denied a request the plaintiffs made at the hearing to extend the TRO to prevent Oakland from clearing out individuals on its neighboring land.  Mod. TRO 5 n.5.  On August 11, 2022, the plaintiffs moved for that same relief because Oakland posted notices that it would begin removal of individuals on its land.  Dkt. No. 59.  The next day, the Hon. James Donato, as general duty judge, denied that motion for lack of standing.  Dkt. No. 64.

United States District Court
Northern District of California

**DISCUSSION**

**I.  SOVEREIGN IMMUNITY**

As an initial matter, Caltrans and associated state officials move to dissolve the TRO because, they argue, the suit is barred by their sovereign immunity. *See* Dkt. No. 67 at 12–13. To the extent that the TRO runs against Caltrans itself, as an agency of the state, it is correct that it is immune from suit in these circumstances (unless it consented or its immunity was validly abrogated by Congress). *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The *officials* of the state, however, are not protected by sovereign immunity from suits that challenge the constitutionality of their actions under *Ex parte Young*, 209 U.S. 123 (1908). *See id.* at 102. Contrary to the defendants' argument, these officials have a sufficiently "direct" connection, *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013), to the challenged conduct for purposes of issuing effective emergency relief. The TRO is immediately dissolved solely to the extent it is against Caltrans as an agency. But the suit may proceed against the director of Caltrans and subordinate officials; because the plaintiffs are not barred by sovereign immunity from obtaining injunctive relief against them, the TRO will be dissolved on the timeline set by this Order.[3]

**II.  THE TRO WILL BE DISSOLVED**

For the reasons that follow, I conclude that the merits and equities no longer favor preventing the closure. The best way to balance the equities is to dissolve the TRO with a delay and in stages such that Caltrans can clear out discrete parts of the encampment in phased operations (as described fully below).

**A. Changed Circumstances Require Dissolving the TRO on a Staggered Timeline**

The TRO was based on the plaintiffs showing "serious questions going to the merits" of their state-created danger claim under the Fourteenth Amendment's Due Process Clause. *See* Mod. TRO 4–7. As previously explained,

---

[3] Additionally, these officials are not necessarily shielded by sovereign immunity from damages liability under 28 U.S.C. § 1983 for unconstitutional acts in their individual capacities. *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991).

4

> The Fourteenth Amendment's Due Process Clause provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amdt. 14 § 1. Under the state-created danger doctrine, a due-process violation occurs "when the state affirmatively places the plaintiff in danger by acting with deliberate indifference to a known or obvious danger." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011) (internal quotation marks and citations omitted). The doctrine also creates an exception to the "general rule" that "members of the public have no constitutional right to sue public employees who fail to protect them against harm inflicted by third parties" when the employees "affirmatively place the plaintiff in a position of danger, that is, where their actions create or expose an individual to a danger which he or she would not have otherwise faced." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018) (internal quotation marks and citations omitted).

Mod. TRO. 4–5. I found that there were "serious questions going to the merits" that "the state's imminent removal of the plaintiffs, when done without sufficient warning or plans for shelter, would expose them to unjustifiable dangers they otherwise would not face." *Id.* 5.

Because of the length of time that has passed, and the additional time given in this order, the merits analysis and the balance of equities no longer favors the plaintiffs. More than five weeks have passed since the first notice of the closure was posted and almost two months will have by the time Caltrans is permitted to begin the first stage of its closure. That puts the plaintiffs in a materially different position than they were when they had five days' warning. As the previous order documented, many of the plaintiffs had resided at the Wood Street encampment for long periods—sometimes years—yet were only given a few days to uproot their lives and make alternative housing arrangements. Mod. TRO 5. Now, they have had substantial notice, any state-created danger is significantly lessened. Much of the showing of danger arose from short notice creating a practical inability to find shelter and other necessities.

I am not sure how many, if any, people living at the Wood Street encampment took advantage of this delay. I explicitly warned the plaintiffs at the July hearing that they should begin making alternative arrangement in earnest; the written TRO explained that it was "not a long-term prohibition on Caltrans's actions, it is a stopgap to prevent a particular violation of constitutional rights that results from the combination of lack of notice and failure to provide alternative shelter." Mod. TRO 2. Today, lack of notice is no longer as serious a concern. On these facts, that the state is not providing each individual with shelter is not sufficient to violate the Constitution. *Cf.*

*Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017) (dismissing state-created danger claim by homeless plaintiffs because mere removal without a showing of a particular danger was insufficient); *Young v. City of Los Angeles*, No. CV2000709JFWRAO, 2020 WL 616363, at *7 (C.D. Cal. Feb. 10, 2020) (essentially same).

This almost two-month-long period of warning and opportunities to make alternative arrangements also tilts the balance of equities. I previously explained that "at some point the equities will stop favoring the plaintiffs." *Id.* 6. That was because,

> Caltrans has shown that there are weighty public safety, health, and welfare concerns that expeditious removal of all individuals on the land will serve. There have been roughly 200 fires at the encampment just in the last two years. See, e.g., Dkt. No. 30-3 ¶¶ 6–7. One in March 2022, killed two dogs and burned three RVs. Id. In April 2022, another fire left an individual in the encampment dead. See id. ¶¶ 8–11. And on July 11, 2022, a "massive" fire in a neighboring encampment damaged a bridge and burned several RVs. Id. ¶¶ 12–14. This last fire apparently was the catalyst for Caltrans wanting to clear the encampment. It has presented evidence that its bridges have previously been harmed by fires and it has real concerns that this will happen at Wood Street given its location near a highway. See Dkt. No. 30-1 ¶ 11. It has also illustrated that the encampment generates large amounts of hazardous waste, debris, and trash. Id. ¶ 6. And, in what it classifies as the gravest concern, there is a wastewater treatment plant near the encampment (and near the location of the most recent fire) with flammable oxygen plants that are necessary for its functioning. See Oppo. 6–7 (collecting citations). These are compelling interests, and the risk of recurrence rises as time goes by.

*Id.* 6–7. And so, "[t]he most equitable way to balance these competing interests is to provide a meaningful period for the plaintiffs and others in the encampment to have forewarning of their removal, time to make plans, and time for advocacy organizations and governmental actors to assist them." *Id.* 7.

These compelling safety and health threats remain as present today as when the TRO issued. The defendants have submitted evidence that there have been twelve fires at Wood Street just since the TRO was issued, one of which was several hundred feet from an electrical substation. *See* Dkt. No. 82 at 12 (collecting citations); *see also* Dkt. No. 82-2 ¶¶ 4–6 (sworn declaration), Dkt. No. 84 (request for judicial notice including government records).[4] Now that the

---

[4] The requests for judicial notice (Dkt. Nos. 68, 84) are GRANTED.

6

plaintiffs will have been given a nearly two-month period, these equitable and public-interest concerns outweigh their interests in remaining on Caltrans's land.

I recognize that when an individual is experiencing homelessness, it is not a simple thing to find a new place of relative security and safety, let alone community. The plaintiffs say they have found that at Wood Street. Concerns like these were why I ordered the parties to appear before Judge Illman to formulate a plan for shelter.[5] But there is not an adequate legal basis to order further or more extensive relief.

In short, given a showing on the merits that is equivocal at best, the equities do not "sharply favor" the plaintiffs beyond the short delay and staggered approach I adopt here, which will allow them one final short period to make plans for where they will go and remove their possessions themselves if they wish.[6]

### B. Overview of the Defendants' Proposals

As a result of the discussions with Judge Illman, Oakland has proposed a concrete plan. *See* Dkt. Nos. 87. I want to express my appreciation for its effort in this regard, as I did at the hearing today. Caltrans has agreed to the general approach of the plan, though it differs on the timeline. Dkt. No. 89. This plan is far from perfect, but it is better than what would have happened without it, and much better than where things stood a month ago.

<u>Timeline.</u> Oakland proposes that the closure not begin for at least two weeks beyond the

---

[5] In opposing lifting the TRO, the plaintiffs rely on my statement that "[p]roviding [adequate] shelter would alleviate the constitutional concerns" that led to the TRO. Mod. TRO. 7. That providing shelter was one possible *cure* for a potential constitutional violation, however, does not mean that there is a constitutional requirement to do so under these circumstances. The constitutional requirement is, instead, not to create an unlawful danger.

[6] In addition to opposing dissolution of the TRO, the plaintiffs move for a broad preliminary injunction that would prevent any closure of Wood Street; require the state and city to mitigate fire and safety risks at the encampment; and require the state, city, and county to develop a plan to provide all individuals at Wood Street with shelter. *See* Dkt. No. 74 at 16–19. The TRO (and any preliminary injunction that could issue) was based on a particular alleged constitutional violation: that the defendants would create an unjustifiable danger by removing the plaintiffs in violation of the Fourteenth Amendment. This legal suit is not about, and would not be an appropriate vehicle for, remedying homelessness at Wood Street or more broadly. For the reasons explained above, further relief is not warranted under the relevant legal test.

hearing date. Dkt. No. 87 at 4. Caltrans argues it should happen the next business day. Dkt. No. 89 at 2. Under Oakland's plan, the closure will proceed in three stages—which was Caltrans's initial plan for the closure before litigation began. *Compare* Dkt. No. 87 at 4, *with* Dkt. No. 30 at 7–8 (Caltrans plan). There will be a delay of two weeks between each stage. Dkt. No. 87 at 4. These delays and this staggering, Oakland represents, will better allow it and the County to provide relocation services and absorb individuals who are removed from the encampment. *Id.*

Shelter. Oakland estimates that it can provide a minimum of 40 available spaces in shelters for individuals who are removed immediately. *Id.* at 5. It commits to "hold[ing] spots" at the beginning of each stage until offers have been made and accepted or declined. *Id.* at 6. In the longer term, Oakland has been working, with Caltrans's support, on creating a "cabin community" near Wood Street that will have space to shelter 50 individuals. *Id.* at 6–7. It anticipates the site being operational in late October or early November 2022. *Id.* This proposal aside, the state recently allocated to Oakland $4.7 million for homelessness, apparently to be targeted at Wood Street. Dkt. No. 2-2 at 32. Oakland, working with Caltrans, has leased five properties for shelter sites in the past two years that provide 196 beds and 15 RV parking spots—though no RV spots are presently available. *See* Dkt. No. 67-9 (declaration). (In the next section of this order, I describe the obligations that the defendants will have concerning Wood Street residents' vehicles.)

Outreach. Under Oakland's proposal, Alameda County would have primary responsibility for conducting the outreach efforts that connect individuals with shelter. *See* Dkt. No. 87 at 4–5. The City represents that it only has two staff members to carry out outreach like this for the entire City. The County, in contrast, has a medical team that, as the County represented at the hearing, visits Wood Street two days each week. The County also represented at the hearing that it does not have funding to carry out the outreach the City contemplates and that its Wood Street medical team is not equipped or trained for that.

The County has proposed no plan of its own, nor has it made any meaningful proposal to address the issues raised in this case in which it is a party and where the individuals affected are County residents. In the next section of this order, I require the City and County to work together to surge their capacity to Wood Street to help connect individuals to shelter being provided by the

8

City. Oakland has offered to train outreach workers. *See id.* at 5:18. Redirecting a few City and County employees into this discrete and limited effort does not seem particularly burdensome. I leave it to them to work out the details and order that they cooperate in good faith so that the necessary outreach occurs.[7]

Homeward Bound. Oakland represents that it (and the County) have resources available to assist individuals who wish to "return home" to family and friends. *Id.* at 7. Oakland commits to using those resources to do so for individuals at Wood Street, even if the family or friend is outside of Oakland. *Id.*

Specialized Housing. Oakland represented in its filing, I repeated at the hearing, and the County did not dispute, that the County has specialized housing for veterans or those who have tested positive for COVID-19. *Id.* at 8. The County and Oakland also "may" have similar housing options for individuals with other "special circumstances." *Id.*

Storage. As I previously noted when denying a TRO based on a Fourth Amendment claim, Caltrans is under judicial decree from a state-court class-action settlement to store most personal property that it takes in encampment closures in (as relevant here) Oakland. *See* Mod. TRO. 7–8. In addition to this, Oakland has committed to coordinate storage of those belongings, and to storing items for 90 days. Dkt. No. 87 at 8. If individuals accept shelter options that would otherwise require them to dispose of certain items, Oakland will "coordinate with Caltrans to also offer storage" of those items. *Id.*

Declined Shelter Proposals. Under Oakland's plan, the defendants' obligations are met even if an individual declines a shelter offer. *Id.* at 8–9. I agree. Otherwise, the plaintiffs could stay indefinitely just by refusing valid offers. Additionally, I explicitly note that the plan does not propose, and dissolution of the TRO is not premised on, making shelter offers to *all* individuals at Wood Street. The resources to do so do not exist at present and I cannot redirect homelessness aid

---

[7] Both the City and County note a lack of budgetary resources to commit to the problem. I am not concerned with how they allocate their funding. At the hearing, I suggested to BNSF Railway's counsel that his client has a stake in the orderly closure of the Wood Street encampment and should be willing to donate money to the governmental entities to augment the outreach efforts that are necessary. While that seems an obvious and appropriate thing for a good corporate citizen and affected neighbor to do, I must rely on its good judgment to do so.

1 that goes to all individuals experiencing homelessness in Oakland and the County to assist only
2 individuals at Wood Street.
3     As I told the plaintiffs at the hearing, I recognize that this plan leaves many gaps and is far
4 from what they want to see from their governments. But it will still assist avoiding a possible
5 constitutional violation and help ensure that large numbers of people receive shelter and have their
6 possessions kept secure. And it will protect public safety, health and welfare.

## DISSOLUTION OF TRO

I adopt the City of Oakland's plan, except as modified by this Order. The motion for a preliminary injunction is DENIED. The temporary restraining order entered at Dkt. No. 40 will be DISSOLVED on the following timeline:

1. The TRO is dissolved immediately to the extent it would prevent Caltrans from removing debris (as opposed to individuals, their possessions, and their structures) from the encampment.
2. The TRO will be dissolved on September 7, 2022, at 12:00 pm, only as it applies to the area previously identified by Caltrans to be the first stage planned to be cleared out (the northern half of its Phase 3 operation (closest to the EBMUD facility). *See* Dkt. No. 30 at 7–8. Caltrans may post notice of the closure on September 5, 2022.
3. The TRO will be dissolved on September 21, 2022, at 12:00 pm, only as it applies to the area previously identified by Caltrans to be the first and second stages to be cleared out. *See id.* Caltrans may post notice of the closure on September 19, 2022.
4. The TRO will be dissolved on October 5, 2022, at 12:00 pm, in its entirety, to permit Caltrans to clear out the area identified for the third stage of clearing. *See id.* Caltrans may post notice of the closure on October 3, 2022.

Dissolution of the TRO is premised in part on the defendants' representations about the actions they will and will not take. Based on that, the need to ensure that the process of dissolving the TRO is orderly, and the need to avoid any further constitutional violations alleged in the complaint, I ORDER as follows:

1. The City of Oakland and County of Alameda shall make good-faith attempts to conduct

outreach efforts to individuals prior to their scheduled removal to connect them to appropriate shelter if such shelter is available. Oakland and the County shall commit resources necessary to make contact with each removed individual if reasonably possible. They shall coordinate their work and may also coordinate with Caltrans, BNSF Railway, or any other entity. For clarity, this order does not require that they provide shelter to *every* person removed from the encampment.

2. When Caltrans removes a vehicle from the encampment, it shall ensure that the vehicle is either (1) turned over to the possessor upon removal or, if that is not feasible, (2) securely maintained in such a way for at least 30 days as to permit the possessor to retake possession of the vehicle. The City of Oakland and County of Alameda are ordered to coordinate in good faith with Caltrans to assist in this effort.

The TRO is further CLARIFIED or MODIFIED so that it does not prevent Caltrans from taking reasonable efforts to prevent the tapping of electrical boxes.

I recognize that no party is happy with this Order. But the time for finger-pointing and disclaimers of responsibility is over. The plaintiffs and all living at the Wood Street encampment must make immediate plans to move. They must comply with the law. The defendants must assist them in relocating to the extent possible, recognizing the humanity of the people they are evicting and their rights to retain property important to them. Closure of the Wood Street encampment in the safest and most compassionate way, in light of the time strictures laid out in this Order, is in every party's best interest.

**IT IS SO ORDERED.**

Dated: August 26, 2022



William H. Orrick
United States District Judge

11